UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LAURIE PEABODY, et al.,

        Plaintiffs,

                             Case No. 2:10-cv-1078
v.                          JUDGE EDMUND A. SARGUS, JR.
                             Magistrate Judge Mark R. Abel

PERRY TOWNSHIP, OHIO, et al.,

        Defendants.

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment of Defendants Perry Township, Ohio and the Perry Township Board of Trustees ("Perry Township") (Doc. No. 55) and the Motion for Summary Judgment of Defendant Shawn Bean (Doc. No. 58). For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** both motions.

## I.

At approximately 11:00 a.m. on August 8, 2010, Defendant Officer Shawn Bean was patrolling Perry Township, Ohio, in his police vehicle when he received a radio dispatch to be on the look out for a stolen white 1996 Ford Explorer that had just been used in a theft offense in Dublin, Ohio, a neighboring city. Officer Bean was informed when he began work that day that the Ford Explorer had been stolen from Perry Township and that it had been used in a theft offense in Westerville, Ohio, another neighboring city.

Officer Bean was patrolling around Sawmill Road, which is a commercial shopping area. He began looking for the Ford Explorer, scanning the Meijer and Target parking lots. Over the radio Officer Bean's sergeant stated that he had spotted the vehicle at an apartment complex behind the Meijer store moving toward the back of the Dick's Sporting Goods store. The vehicle

was fleeing from his sergeant, who was in pursuit.

Officer Bean turned on his lights and siren and headed toward that location. As Officer Bean turned into an access road between two stores, he spotted the Ford Explorer traveling at a high rate of speed, fishtailing as it turned. He lost sight of the vehicle for a few seconds after it turned behind Dick's Sporting Goods. The path the Ford Explorer was traveling was blocked by an eight foot fence. As Officer Bean turned behind the store, he saw the vehicle against the fence and Hook running toward him, away from the fence. As Hook saw Officer Bean's cruiser, he turned and began to run back toward the Ford Explorer. There were no other officers at the scene. Officer Bean's cruiser camera was on and the events were videotaped. (Cruiser Video; Bean Dep. Ex. 14; Doc. No. 44-14.)

Officer Bean exited his cruiser, began running after Hook and yelling "Police Officer, Stop." Hook continued to run and jumped on the hood of the Ford Explorer and began to climb the fence. Officer Bean deployed his Taser, which took effect as Hook reached the top of the fence. Hook fell over the fence onto the blacktop on the other side, suffering serious head injuries. It took approximately five seconds from the time Officer Bean exited his cruiser to the time that the Taser incapacitated Hook.

The video does not show exactly when Officer Bean pulled the trigger that deployed the Taser and the parties do not agree as to when the shooting of the Taser was initiated. The parties' experts viewed the videotape and looked at, *inter alia*, the shadow of Officer Bean's arm and at when it became fully extended, and they looked at the bagginess of the clothing worn by Hook and whether it may have slowed the effect of the Taser. From this information, the experts offer their contrasting opinions as to when it is reasonable to assume that Officer Bean pulled the

2

Taser's trigger.

The video recording itself captured Officer Bean's statements made at the scene of the incident approximately fifteen minutes after the tasing. Officer Bean stated that Hook's hands were on top of the fence "[a]nd he just kind of -- he was apparently going to start to go over. . . . [a]nd as he started to go over, of course, when I tased him, he locked up and he just fell forward, instead of falling straight down or back." (Bean Dep. Ex. 14; Transcript of Cruiser Cam, Ijames Dep. Ex. 26; Doc. No. 46-4.) He then said, "He started to climb up the fence. As I'm running after him, I took my Taser out . . . . when I got up to about the back of where that bumper is, the thing, I tased him. He was at the top. Well, he locked up and went forward and hit his head." *Id.* And. a short time later Officer Bean stated, "But then as he tried to get – as he was up at the top, I'm running after him, I'm screaming, you know, police officer, stop, stop. I got my taser out. He got to the top, and I tased him. And I figured he just – well, he fucking went—he sprung forward." *Id.*

Officer Bean later testified that he believes that he deployed the Taser before Hook reached the top of the fence and that he expected Hook to fall back on the hood of the vehicle or slide down the side of the fence he was climbing. There is no dispute, however, that the Taser took effect as Hook reached the top of the fence, that the tasing incapacitated Hook, that Hook sprung forward over the fence and that he landed on the other side of the fence on the blacktop.

Perry Township investigated this incident and determined that Officer Bean had complied with its Use of Force Policy. (Use of Force Policy; Bean Dep. Ex. 4; Doc. No. 44-4.) The Use of Force Policy instructs officers on "constitutional adherence" in the use of force. *Id.* at Ch. 1, § 1. The Policy instructs officers to use reasonable force based on the circumstances. It also provides

3

the definition of reasonable force specifically relying on the United States Supreme Court case *Graham v. Connor*, 490 U.S. 386 (1989). The Policy sets out parameters on the use of force, explaining that the degree of force used must be determined by the use of force continuum. The Policy articulates that the continuum "provides a reasonable and objective guideline for officers to follow in the application of force." *Id.* at 4. Again, relying on *Graham v. Connor*, the Policy outlines the "objectively reasonable" test, explaining each of its components. It also sets out policies on the use of deadly force and firearms responses and less than lethal force responses, including chemical sprays, police batons and Tasers. The Policy requires officers to complete an instructional Taser class before using a Taser and calls for officers to follow the manufacturers' guidelines as outlined in the Taser Operator's Manual and any updates or advisories to the guidelines. Officer Bean completed the required training, and was also certified as a Taser instructor. (Certificate; Bean Dep. Ex. 13; Doc. No. 44-13.)

On November 30, 2010, Plaintiffs Laurie Peabody, individually and as guardian of Matthew Hook, Thomas Hook, and C.H., a minor, by and through her mother S.R., initiated this lawsuit against Officer Bean and Perry Township. Plaintiffs allege that Defendants violated Hook's right to be free from the use of excessive force by state actors and that Perry Township's policies were the moving force behind Officer Bean's unconstitutional actions. Plaintiffs also allege the state law claims of assault and battery and loss of consortium.

On April 23, 2012, Perry Township and Officer Bean moved for summary judgment. (Doc. Nos. 55, 58.) Those motions are ripe for review. (Doc. Nos. 60, 64, 65.)

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as

4

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Liberty Lobby*, 477 U.S. at 251–52).

## III.

Plaintiffs bring their excessive force claims under 42 U.S.C. § 1983, which creates a private right of action against state officials who deprive individuals of their constitutional rights, under color of state law. Officer Bean moves for summary judgment on the basis of qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff [shows] (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[L]ower courts

5

have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."
*Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

"The defendant bears the burden of pleading the defense [of qualified immunity], but the
plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly
established that a reasonable official in his position would have clearly understood that he or she
was under an affirmative duty to refrain from such conduct." *Sheets v. Mullins*, 287 F.3d 581,
586 (6th Cir. 2002) (citing *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir.
1992)). "The ultimate burden of proof is on the plaintiff to show that the defendant is not
entitled to qualified immunity." *Id.* (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir.
1991)). If the plaintiff fails to carry this burden as to either element of the analysis, qualified
immunity applies to shelter the defendant from liability.

## A.  Constitutional Right

The Fourth Amendment to the United States Constitution prohibits the government from
engaging in "unreasonable searches and seizures." U.S. Const. amend. IV.  "Determining
whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment
requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth
Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490
U.S. at 396 (citations omitted). In addition, when considering the threat to the safety of others, it
is appropriate to consider the relative culpability of those involved. *Scott v. Harris*, 550 U.S.
372, 384 (2007). "Because '[t]he test of reasonableness under the Fourth Amendment is not
capable of precise definition or mechanical application,' *Bell v. Wolfish*, 441 U.S. 520, 559
(1979), however, its proper application requires careful attention to the facts and circumstances

6

of each particular case, including the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

or attempting to evade arrest by flight. *See Tennessee v. Garner*, 471 U.S. [1], 8–9 [(1985)] (The

question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.')."

*Graham*, 490 U.S. at 396.

The Supreme Court also directed that in applying the test, courts must consider the

difficulties of modern police work:

> The "reasonableness" of a particular use of force must be judged from the perspective
> of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.
> . . . The calculus of reasonableness must embody allowance for the fact that police
> officers are often forced to make split-second judgments–in circumstances that are
> tense, uncertain, and rapidly evolving–about the amount of force that is necessary in
> a particular situation.

*Id.* at 396–97 (internal citations omitted).

In the case *sub judice*, Officer Bean was advised that Hook had committed felony theft of

a vehicle, and also was suspected of two burglaries, from which he was evading capture of two

police jurisdictions while in the stolen vehicle. Officer Bean testified that he did not believe that

Hook was armed and Hook did not pose an imminent threat to the safety of Officer Bean or

anyone else. Officer Bean knew, however, that if Hook escaped, he would have access to the

inside of Dick's Sporting Goods store, during open business hours, and would be beyond Officer

Bean's control. It is also undisputed that Hook was resisting arrest. *See Cockrell v. City of*

*Cincinnati*, 468 F. App'x 491, 496 (6th Cir. 2012) (confirming that fleeing is a form of

resistance). In sum, Officer Bean knew that Hook was fleeing from him, was driving a stolen car

and was implicated in two recent burglaries. The Officer also did not believe Hook was armed or

7

otherwise threatening harm to him or the public.

Viewing these facts in the light most favorable to Hook, a reasonable jury could find that the force used by Officer Bean was excessive in that it created a substantial risk of causing death or serious bodily harm to Hook, *i.e.*, that Bean employed lethal or deadly force. *See Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988) (defining lethal force); *Snauer v. City of Springfield*, 09-CV-6277-TC, 2010 U.S. Dist. LEXIS 124770, 2010 WL 4875784 (Oct. 1, 2010) (denying qualified immunity to officer who tased a suspect who was cresting a six to seven foot high fence, which could be seen as deadly force).

"Undoubtedly, 'the intrusiveness of a seizure by means of deadly force is unmatched.'" *Whitlow v. City of Louisville*, 39 F. App'x 297, 303 (6th Cir. 2002) (citing *Garner*, 471 U.S. at 9). "Therefore, only in rare instances may an officer seize a suspect by use of deadly force." *Id.* (citing *Garner*, 471 U.S. at 9). "[W]hether the use of a law enforcement tool amounts to deadly force is a mixed question of law and fact . . . ." *Howser v. Anderson*, 150 F. App'x 533, 539 (6th Cir. 2005) (citing *Robinette*, 854 F.2d at 912). And, "whether deadly force has been used to seize a criminal suspect must be determined in the context of each case." *Robinette*, 854 F.2d at 912; *see also Scott*, 550 U.S. at 383 (Regardless of whether "deadly force" or some amount of lesser force was used, "in the end we must still slosh our way through the factbound morass of 'reasonableness.'").

It is not for this Court to conclusively decide whether the force used was deadly force – only whether a reasonable jury could, or could not, find that the amount of force used created a substantial risk of serious bodily injury or death. The Court further notes that if this case is not viewed as one in which a reasonable jury could find lethal force, then Officer Bean would be

8

entitled to qualified immunity. That is, if the situation were the exact same but Hook's flight

from arrest was not over an eight foot fence, no reasonable jury could find that the amount of

force used was excessive. The Court would not second guess Officer Bean's split-second

decision to tase Hook instead of tackling him or letting him escape. *See Smith v. Freland*, 954

F.2d 343, 347 (6th Cir. 1992) (great weight given to officer's on-the-spot judgment when events

happen very quickly); *see also Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th

Cir. 2012) (resistance, including fleeing, marks the line between reasonable and unreasonable

tasing); *Cockrell* 468 F. App'x at 496–97 (same). Even if the Court were to conclude that the

reasonableness of Officer Bean's choice to use the Taser on Hook as he fled across a flat parking

lot was a close call, it would defer to the Officer's choice. *Hagans*, 695 F.3d 505 ("The essence

of qualified immunity, however, is to give government officials cover when they resolve close

calls in reasonable (even if ultimately incorrect) ways.").

This situation, however, is different. Because a reasonable jury could find that Officer

Bean utilized deadly force, this Court reviews his decision in a broader sense in that it considers

the use of lethal force in the absence of an immediate threat to the safety of Officer Bean or the

public. In this respect, the law is clear that deadly force requires a suspect to pose an "immediate

threat either to the officer or others." *Garner*, 471 U.S. at 11.

The Court here does not ignore Officer Bean's contention that it was reasonable for him

to consider that Hook posed a threat to the public in and around Dick's Sporting Goods. *See*,

*e.g.*, *Patrick v. Moorman*, 855 F. Supp. 2d 392, 402 ("[The suspect]'s failure to behave

aggressively towards the civilians he encountered prior to meeting [the officer] has little

probative value as to his dangerousness in flight. A reasonable officer could readily conclude

9

that a suspect who behaved non-violently while fleeing the site of a crime might behave very

differently when sprinting away from imminent arrest."). Nevertheless, the type of threat posed

by Hook is not of the nature or quality of that in which an officer may employ lethal force. The

Sixth Circuit has "upheld the use of deadly force by a police officer when the factual situation

revealed a perceived serious threat of physical harm to the officer or others in the area from the

perspective of a reasonable officer." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (citing

*Boyd v. Baeppler*, 215 F.3d 594, 604 (6th Cir. 2000) (upholding qualified immunity for police

officers who used deadly force against a suspect who had a gun in his hand and who pointed it at

officers and others); *Bell v. City of E. Cleveland*, 1997 U.S. App. LEXIS 28738, No. 96-3801,

1997 WL 640116, at *3 (6th Cir. Oct. 14, 1997) (upholding qualified immunity for a police

officer who shot and killed a boy who pointed a toy gun at the officer); *Rhodes v. McDannel*, 945

F.2d 117, 120 (6th Cir. 1991) (upholding qualified immunity for police officer who shot and

killed a homeowner who approached police officers with a raised machete in his hand and

ignored repeated warnings to drop the weapon)).

Thus, the use of deadly force requires an imminent threat to the safety of the officer

and/or the public, not just a potential threat. Here, there are no facts to support that Hook posed

an imminent threat to the public or to Officer Bean. Indeed, Officer Bean, the Perry Township

Chief of Police Robert L. Oppenheimer and Officer Bean's expert Steve Ijames all agree that

Officer Bean would not have been justified in using a firearm against Hook. (Bean Dep. at 143;

Oppenheimer Dep. at 77; Doc. No. 57; Ijames Dep. at 74–75; Doc. No. 46.) Therefore, if a jury

determines that Officer Bean utilized lethal force, he violated Hook's Fourth Amendment right to

be free from excessive force.

**B. Clearly Established**

Having determined that the evidence as to whether Officer Bean utilized deadly force presents sufficient disagreement to require submission to a jury, the Court turns to the second step of the qualified immunity analysis which considers whether the constitutional right at issue was clearly established. A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he or she is doing violates that right. *al-Kidd*, 131 S. Ct. at 2083 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

It is clearly established constitutional law that an officer cannot shoot a fleeing felon in the back in the absence of the suspect posing an imminent threat to the officer or others. *Smith v. Cupp*, 430 F.3d 766, 775–76 (6th Cir. 2005) (citing *Garner*, 471 U.S. at 9). "Use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Garner*, 471 U.S. at 11. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.*

The Court finds that the contours of the right to be free from lethal force in the circumstances before it are sufficiently clear that every reasonable official would have understood that the use of lethal force on Hook violated his constitutional rights.

**C. Conclusion - Officer Bean's Motion for Summary Judgment**

Based on the foregoing, the Court concludes that a reasonable jury could find that Officer Bean utilized lethal force, and therefore violated Hook's Fourth Amendment right to be free from excessive force. Accordingly, the Court **DENIES** Officer Bean's Motion for Summary

11

Judgment.

### IV.

Plaintiffs also bring claims for assault and battery, loss of consortium and municipal liability. Defendants move for summary judgment on these claims.

### A. Municipal Liability[1]

Plaintiffs contend that Perry Township is liable under 42 U.S.C. § 1983 for Hook's injuries. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978). "A municipality or other local government may be liable under this section if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (quoting *Monell*, 436 U.S. at 692). "But, under § 1983, local governments are responsible only for 'their own illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). "They are not vicariously liable under § 1983 for their employees' actions." *Id.* (citing *Monell*, 436 U.S. at 691; *Canton v. Harris*, 489 U.S. 378, 392 (1989); *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (collecting cases)).

Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S. at 691, 694. "[T]he official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body . . . ." *Polk Cnty. v. Dodson*, 454 U.S. 312, 326

---

[1]Federal case law refers to "municipal liability" to include municipalities but also other political subdivisions such as counties and townships. The Court understands that Perry Township is not a municipality, but is nonetheless included within the term as it is used in § 1983 cases.

12

(1981) (quoting *Monell*, 436 U.S. at 694). "[O]nce a municipal policy is established, 'it requires

only one application . . . to satisfy fully *Monell's* requirement that a municipal corporation be

held liable only for constitutional violations resulting from the municipality's official policy.'"

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 n.6 (1986) (citing *Oklahoma City v. Tuttle*, 471

U.S. 808, 822 (1985) (plurality opinion); *id.* at 831-832 (Brennan, J., concurring in part and

concurring in judgment)).

Plaintiffs argue that Officer Bean's alleged violation of Hook's constitutional rights

resulted from the Township's (1) Use of Force Policy, (2) its failure to train Officer Bean

regarding the Taser's potential as a deadly weapon, and (3) its ratification of Officer Bean's use

of force.

### 1. Use of Force Policy

Plaintiffs contend that Perry Township's Use of Force Policy was the moving force

behind Officer Bean's alleged violation of Hook's constitutional rights. Plaintiffs maintain that

the Policy authorizes officers to utilize Tasers whenever intermediate force is justified, with no

regard for whether using the Taser in the specific circumstance constitutes deadly force and thus

requires a higher level of justification. They argue that the Policy "proximately caused Hook's

injury by short-circuiting the *Graham/Scott* balancing test that requires officers to evaluate what

force to use—even in rapidly unfolding scenarios—according to objectively reasonable factors."

(Pl. Mem. in Opp. at 18; Doc. No. 60) (referring to *Graham v. Connor*, 490 U.S. 386, 396 (1989)

and *Scott v. Harris*, 550 U.S. 372, 384 (2007)). In reply, Perry Township asserts:

> Defining the taser as an intermediate weapon does not short-circuit the instructive
> law on the use of force. Considering a taser an intermediate weapon does not
> alleviate the requirement under the policy to judge the reasonableness of the force

13

> based on the totality of the circumstances. Plaintiffs simply assume that the Township's policy allows its officers to use a taser in all instances because the mechanism itself is not considered a deadly weapon. Plaintiffs' interpretation of the policy is incorrect.

(Def. Reply at 6) (internal citation to Use of Force Policy omitted).

While the Court does not agree that the Township's Policy short-circuits "the *Graham/Scott* balancing test," it does agree with Plaintiffs that a reasonable jury could conclude that its lack of guidance on the Taser's potential to constitute deadly force was the moving force behind Officer Bean's tasing of Hook.

Perry Township's Use of Force Policy categorizes the Taser as an exclusively intermediate weapon and fails to warn officers that Tasers may constitute deadly force. The Policy specifies two types of instruments under its section on deadly force – firearms and knives. (Use of Force Policy § 1.3.2, Deadly Force and Firearms Response.) Tasers are considered under the section of the Policy titled "Less Than Lethal Force," in a subsection titled "Non-Lethal Force." *Id.* § 1.3.4(A). This categorization of the extent of force associated with Tasers comports with Officer Bean's understanding that deploying a Taser on a person on an elevated surface could not cause substantial injury or death:

> Q. Would you agree that a TASER deployed on -- against a person on an elevated surface can cause substantial injury or death?
>
> A. No.

(Bean Dep. at 151.)

This interpretation of the Policy is confirmed by Perry Township Lieutenant Robert I. Pendleton in the following exchange:

> Q. Okay. And you'd expect that an officer who's using a TASER would

14

consider whether the TASER would cause somebody to fall from an elevated surface as part of his determination as to whether the use of the TASER force is reasonable, right?

A.      Are you -- I would believe so.  But it's not the consideration that the officer is going to take.  He's not using deadly force.

(Pendleton Dep. at 80; Doc. No. 62.)

The Use of Force Policy authorizes the use of the Taser as an intermediate weapon to overcome any resistance during arrest: "Officers when confronted by offenders or individuals who are resisting a lawful arrest or acting in an aggressive manner may employ intermediate weapons to overcome resistance or aggressive behavior." (Use of Force Policy § 1.3.4, Less Than Lethal Force, Purpose.)   The Policy details some circumstances where an officer "should be prudent before deploying" the Taser, including against those who are physically challenged, pregnant, elderly or those with debilitating illness, vehicle drivers, individuals near combustible gases or blasting materials and subjects handcuffed unless they pose a danger to themselves or others. *Id.* at § 1.3.4(D)(7).  The Policy does not instruct prudence when tasing suspects on elevated surfaces.

The Use of Force Policy also requires that officers follow manufacturer guidelines and subsequent manufacturer updates or advisories. *Id.* at § 1.3.4(D)(1).  However, Perry Township has no system in place for distributing the latter to officers at the department, and Chief Oppenheimer was not aware that Taser International issued such advisories.  (Oppenheimer Dep. at 103–104.)  It is not surprising that Officer Bean was unfamiliar with the update that Taser International issued warning that people standing on elevated surfaces were "[e]specially at risk" during tasing for increased "risk of death or serious injury" from uncontrolled falls.

15

(Manufacturer Warning, Instructions and Information to Law Enforcement; Bean Dep. Ex. 5;

Doc. No. 44-5.)

There is no dispute before the Court regarding whether Officer Bean's tasing of Hook

complied with the Township's Policy. Both Lieutenant Pendleton and Chief Oppenheimer

concluded that, whether Hook's feet were a few feet off the ground or on top of the eight foot

fence, Officer Bean acted according to departmental policy when he Tased Hook:

> Q.     My question is: Assume everything else is equal, all the other findings you
> have in your report are the same, all the other facts you know are the same.
>
> A.     Yes.
>
> Q.     But just assume that you're now satisfied that Mr. Hook's feet were at the top
> of the gate and he was TAS'd by Officer Bean when his feet were at the top
> of the gate.
>
> A.     Uh-huh.
>
> Q.     That's the only fact I'm changing. With that fact altered – tell me whether
> that would, nonetheless, comply with departmental policy.
>
> A.     I believe that the officer, even if Mr. Hook's feet were on top of the gate, the
> officer would have still acted properly when he deployed his TASER.

(Pendleton Dep. at 66–68) (objections omitted).

> Q.     . . . Assuming everything, all the other facts as you know them now, and just
> changing one thing -- that is, that Officer Bean pulled the trigger when
> Matthew Hook's feet were on top of the gate -- would that change your
> decision that Officer Bean was acting consistent with Perry Township use of
> force policy?
>
> A.     Yes, sir. I still believe he was acting within our policy.

(Oppenheimer Dep. at 56.)

As Plaintiffs correctly point out, because the Policy allows intermediate force to be

deployed against a fleeing suspect and the Taser is defined exclusively as an intermediate weapon, Officer Bean felt justified, as did his superiors, in using the Taser, without consideration that the force could constitute deadly force.

Based on the foregoing, the Court concludes that the evidence presents a sufficient disagreement as to whether the Perry Township's Use of Force Policy was the "moving force" behind Officer Bean's alleged unconstitutional use of deadly force that submission to a jury is required. Consequently, the Court **DENIES** Perry Townships's Motion for Summary Judgment on this claim.

### 2. Training

Plaintiffs assert that it was Perry Township's failure to train Officer Bean regarding the Taser's potential as a deadly weapon when used against persons on elevated surfaces that was the moving force behind the Officer's alleged violation of Hook's constitutional rights. The Supreme Court recently explained the "tenuous" nature of a § 1983 claim that "turns on a failure to train":

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S., at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*, at 389.
>
> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." [*Board*

17

*of Comm'rs of] Bryan Cty.* [*v. Brown,*] 520 U.S. [397,] 410 [(1997)]. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*, at 407. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S., at 395 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ." *Id.*, at 392; *see also Pembaur, supra*, at 483 (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . . .").

*Connick*, 131 S. Ct. at 1359–60 (parallel citations omitted). *Connick* went on to explain the type

of evidence necessary to establish that a municipality was deliberately indifferent to the rights of

persons with whom the untrained employees come into contact.

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cty.*, 520 U.S., at 409. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action--the 'deliberate indifference'--necessary to trigger municipal liability." *Id.*, at 407. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Id.* at 1360 (parallel citations omitted).

In the instant action, Plaintiffs do not support their claim with evidence of a pattern of

similar alleged constitutional violations. Instead, Plaintiffs rely on the "single-incident" liability

that the Supreme Court hypothesized in *City of Canton*. That type of liability attaches when the

alleged constitutional violation was the "obvious" consequence of failing to provide specific

training, and that this showing of "obviousness" can substitute for the pattern of violations

ordinarily necessary to establish municipal culpability. *See id.* at 1361. In *Connick*, the Court

18

explained that it did not foreclose the rare possibility that the unconstitutional consequences of failing to train could be so patently obvious that it would subject the municipality to § 1983 liability.

> In *Canton*, the Court left open the possibility that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference. *Bryan Cty*., *supra*, at 409. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. *Canton*, *supra*, at 390, n. 10. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. *Bryan Cty*., *supra*, at 409. The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.

*Connick*, 131 S.Ct. at 1361 (parallel citations omitted).

The case *sub judice* is simply not that rare case where the alleged failure to train was so patently obvious that Perry Township would be liable under § 1983 without proof of a pre-existing pattern of violations. Unlike the *City of Canton* hypothetical, Officer Bean was trained on Taser use and the training material included information on the risks of tasing individuals on elevated surfaces. Plaintiffs' arguments are more accurately described as complaints about the alleged unsatisfactory training of Officer Bean and how that training could have been better. *See*, *e.g.*, (Pl. Mem. in Opp. at 33) (suggesting that if Officer Bean had been required to have further training his "initial failure to absorb material [could have] be[en] cured").

However, as the Township correctly asserts, Plaintiffs "'must do more than point to something the [Township] could have done to prevent the unfortunate incident.'" (Mot. for

19

Summ. J. at 12) (quoting *Kahlich v. City of Grosse Pointe Farms*, 120 F. App'x 580, 585 (6th Cir. 2005)). Allegations "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. *City of Canton*, 489 U.S. at 390–91 (citing *Springfield v. Kibbe*, 480 U.S. 257, 268 (1987) (O'Connor, J., dissenting); *Tuttle*, 471 U.S. at 821 (opinion of Rehnquist, J.)). "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id.* at 391.

Viewing the evidence in the light most favorable to Plaintiffs, and drawing all justifiable inferences in their favor, the Court concludes that they have failed to raise any genuine issue of material fact as to whether Perry Township's alleged failure to train Officer Bean amounted to deliberate indifference to the rights of persons with whom he would come into contact. Accordingly, the Court **GRANTS** the Township's Motion for Summary Judgment on this claim.

### 3. Ratification

Plaintiffs argue that ratification of Officer Bean's actions by Perry Township can subject it to § 1983 liability in two ways that are applicable to the facts of the present case. First, Plaintiffs posit, "an official with final policymaking authority may approve of both an employee's unconstitutional acts and the basis for them." (Pl. Mem. in Opp. at 25.) Second, Plaintiffs continue, "an official with final policymaking authority may approve of an investigation into an employee's unconstitutional acts that is so inadequate as to constitute a ratification of those acts." *Id.*

As to Plaintiffs' first proposition, they contend:

20

Under the first theory, "[i]f the authorized policymaker[] approve[s] a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because the decision is final." *Id.* at 127. *See Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997); *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) ("Ratification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate.").

In the present case, Chief Oppenheimer had the final say *not* to initiate discipline against Officer Bean. Oppenheimer Dep. at 19:3-16; 49:8-22. *See also* O.R.C. §737.12 (providing that the chief of police has the "exclusive right" to suspend officers); *Wright v. City of Canton, Oh.*, 138 F. Supp. 2d 955, 965 (N.D. Ohio 2001) (holding that a chief's approval of an investigation not resulting in discipline "constitutes municipal policy").

*Id.* (emphasis and alterations in original). Plaintiffs, however, conflate the different theories of ratification.

That is, Plaintiffs rely upon *Wright v. City of Canton* to support its contention that Perry Township's approval of the investigation of Officer Bean's tasing of Hook, which did not result in discipline, constitutes municipal policy sufficient to satisfy this first ratification theory. However, *Wright* does not stand for such a proposition. Instead, *Wright* only discusses Plaintiffs' second theory of liability based on the approval by "a final municipal policymaker" of an investigation "that was so inadequate as to constitute a ratification of [the officers'] alleged use of excessive force." *Wright*, 138 F. Supp. 2d at 966.

Further, while it is true that the Sixth Circuit case upon which Plaintiffs rely does indicate that "'if the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final' policy." *Feliciano*, 988 F.2d at 656 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Its analysis, however, does not stop there. *Feliciano* makes clear that "mere acquiescence in a

21

single discretionary decision by a subordinate is not sufficient to show ratification. Otherwise, the City would be liable for all of the discretionary decisions of its employees, and this would be indistinguishable from *respondeat superior* liability." *Id.* (citations omitted). *Feliciano* goes on to point out that "even if it were shown that the municipality subsequently ratified the decision, the plaintiffs would then have to prove that the ratification was a 'moving force' in causing the constitutional violation." *Id.* at 656 n.6 (citing *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991)).

Here, Plaintiffs make no argument that the ratification was the "moving force" behind the alleged constitutional violation. As the Sixth Circuit explained in *Williams v. Ellington*, *supra*, a municipality "cannot be held liable for the ratification of the" alleged unconstitutional conduct based on a "single, isolated decision" because such a "decision can hardly constitute the 'moving force' behind the alleged constitutional deprivation." *Williams*, 936 F.2d at 884–85 (noting that "[t]here was no history that the policy had been repeatedly or even sporadically misapplied by school officials in the past"). Thus, Plaintiffs have failed to show that there could be any liability pursuant to their first ratification theory.

The Court now turns to whether Chief Oppenheimer's and Lieutenant Pendleton's investigation of Officer Bean's tasing of Hook was so inadequate as to constitute a ratification of those acts, Plaintiffs' second theory of liability. As to this type of § 1983 liability, this Court has stated:

> A municipality may, however, ratify its employees' acts – thereby subjecting itself to § 1983 liability–by failing meaningfully to investigate those acts. *Wright v. City of Canton*, 138 F. Supp. 2d 955, 966 (N.D. Ohio 2001); *see Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246–48 (6th Cir. 1989); *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985). Viewed in this light, evidence that a municipality inadequately investigated an alleged constitutional violation can be seen as evidence of a policy

22

that would condone the conduct at issue.

*Otero v. Wood*, 316 F. Supp. 2d 612, 627–28 (S.D. Ohio 2004). In *Otero*, this Court relied upon *Marchese* and *Leach*, two Sixth Circuit cases regularly cited for this type of liability, and on the Northern District of Ohio's decision in *Wright v. City of Canton*.

In *Marchese*, a county sheriff failed to investigate his deputies' beating of an inmate who earlier threatened a deputy's life. The court found that the sheriff's failure to investigate constituted ratification of his deputies' unconstitutional acts. And because the sheriff acted as the county's final policymaker with regard to law enforcement matters, the court considered this ratification as municipal policy for purposes of § 1983. *Marchese*, 758 F.2d at 188.

Likewise, in *Leach*, a county sheriff did not investigate his employees' failure to provide for the medical needs of a paraplegic inmate. The court relied on *Marchese* and imposed liability on the municipality:

> Thus, like *Marchese*, the Sheriff here ratified the unconstitutional acts. In *Marchese*, such ratification was deemed sufficient to attach liability to the sheriff and the County. We find it equally sufficient in this context.

*Leach*, 891 F.2d at 1248.

In the present matter, Plaintiffs rely on *Wright v. City of Canton*, to support their position that the investigation into Officer Bean's tasing of Hook was so inadequate as to constitute a ratification of his alleged use of excessive force. In that case, the court found that a reasonable juror could conclude that the City's approval of the investigation meant that it ratified the alleged use of excessive force because the plaintiff offered "evidence showing the investigation was not designed to discover what actually happened to Wright while in [the officers'] custody." 138 F. Supp. 2d at 966. As to the evidence before it the court indicated:

23

> Most notably, Captain Myers never interviewed Dr. Hamrick as part of his internal
> affairs investigation. Myers never discussed Wright's injuries with Dr. Hamrick.
> Nor did he inquire as to [the officers'] behavior the night of the incident. Thus,
> Myers concluded his investigation without knowing that Dr. Hamrick (1) insists [the
> officers] gave three different stories as to how Wright suffered his injuries and (2)
> believes Wright was not injured as a result of a single takedown.

*Id.* at 966–67.

The Court finds that *Marchese*, *Leach* and *Wright* all support Perry Township's position

that there is no § 1983 liability based on a ratification theory. In neither *Marchese* nor *Leach* was

there *any* investigation into the alleged unconstitutional conduct. Additionally, there are no

similar claims before this Court that were present in *Wright*, where the investigator failed to

interview the complaining witness – the doctor to whom three different stories were told as to

how the prisoner received his injuries and who did not believe the injuries could have occurred as

the officers claimed.

While Plaintiffs complain that the investigation of Officer Bean's tasing of Hook was not

sufficient and offer several ways in which it would have been better, that is insufficient to raise

any genuine issue as to whether § 1983 liability is appropriate. Chief Oppenheimer spent several

hours reviewing the incident reports, watched the cruiser video thirty to forty times and spoke

with the Township attorneys regarding Officer Bean's actions. The Chief focused his

investigation on trying to determine when Officer Bean pulled the trigger, thereby deploying his

taser toward Hook. (Oppenheimer Dep. at 50–53.) Chief Oppenheimer spoke to other police

chiefs regarding the event as part of his review. *Id.* at 54. Additionally, Chief Oppenheimer

interviewed Officer Bean regarding his account of the incident at issue. *Id.* at 65–67. He also

referred the matter to Lieutenant Robert Pendleton for an objective review of this incident. *Id.* at

24

24–25. Lieutenant Pendleton authored a "Use of Force Investigation Report." (Investigation

Report; Bean Dep., Ex. 10; Doc. No. 44-10.)

Even when viewing the evidence in the light most favorable to Plaintiffs, and drawing all

justifiable inferences in their favor, the Court concludes that no reasonable jury could find that

the investigation into Officer Bean's tasing of Hook was so inadequate as to constitute a

ratification of his alleged use of excessive force that is sufficient to support § 1983 liability.

Therefore, the Court **GRANTS** Perry Township's Motion for Summary Judgment on this claim.

## B. Assault and Battery

Plaintiffs allege that Officer Bean committed assault and battery when he tased Hook.

Ohio law provides that the tort of assault consists of

> the willful threat or attempt to harm or touch another offensively, which threat or
> attempt reasonably places the other in fear of such contact. The threat or attempt
> must be coupled with a definitive act by one who has the apparent ability to do the
> harm or to commit the offensive touching. An essential element of the tort of assault
> is that the actor knew with substantial certainty that his or her act would bring about
> harmful or offensive contact.

*Stevens v. Provitt*, 2003 Ohio 7226, 2003 WL 23097088, at *3 (Ohio App. 11th Dist. Dec. 31,

2003) (quoting *Smith v. John Deere Co.*, 83 Ohio App.3d 398 (Ohio App. 10th Dist. 1993)). The

tort of battery exists when a person acts with the intent to cause a harmful or offensive contact

and such a harmful contact actually results. *Love v. City of Port Clinton*, 37 Ohio St. 3d 98, 99

(1988) (citing Restatement of the Law 2d, Torts (1965) 25, Section 13)).

Officer Bean argues that he is entitled to summary judgment on this claim because he is

immune under Ohio Revised Code Chapter 2744, which creates a presumption of immunity for

political subdivision employees, subject to certain exceptions. Plaintiffs posit that the exception

25

found in § 2744.03(A)(6)(b), applies to defeat immunity here.  This Court disagrees.

The section upon which Plaintiffs rely provides an exception from immunity when "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner[.]"  Ohio Rev. Code § 2744.03(A)(6)(b).  Ohio courts define "malice" as "the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified."  *Cook v. City of Cincinnati*, 103 Ohio App. 3d 80, 90 (Ohio App. 1st Dist. 1995) (citation omitted).  "'Bad faith' involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another."  *Id.* at 90–91 (citation omitted).  With regard to wanton or reckless conduct, the Ohio Supreme Court explains:

> The standard for showing wanton misconduct is, however, high.  In *Hawkins v. Ivy* (1977), 50 Ohio St. 2d 114, syllabus, we held that wanton misconduct was the failure to exercise any care whatsoever.  In *Roszman v. Sammett* (1971), 26 Ohio St.2d 94, 96-97, we stated, "mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor."

*Fabrey v. McDonald Village Police Dep't*, 70 Ohio St. 3d 351, 356 (Ohio 1994) (parallel citations omitted).

The Court agrees with Officer Bean that no reasonable jury could find that he acted with malicious purpose, in bad faith or in a wanton or reckless manner when he tased Hook.  There is no evidence before the Court tending to show that Officer Bean harbored a willful or intentional design to seriously harm Hook.  Further, there is no evidence to support that Officer Bean acted with a dishonest purpose or that his conduct reflected ill will or conscious wrongdoing.  Finally, the evidence falls well short of showing that Officer Bean failed to exercise any care whatsoever

26

or a disposition to perversity on his behalf. Officer Bean consistently testified that he believed

Hook would fall back on the hood of the car or fall down on the near side of the fence. While

ultimately Officer Bean's assessment was shown to be incorrect, his conduct does not reflect the

type that works to defeat the immunity provided in Ohio Revised Code Chapter 2744.

Consequently, the Court **GRANTS** Officer Bean's Motion for Summary Judgment as it relates to

Plaintiffs' assault and battery claim.

## C. Loss of Consortium

Perry Township moves for summary judgment on Plaintiffs' loss of consortium claim.

"A cause of action based upon a loss of consortium is a derivative action. That means that the

derivative action is dependent on the existence of a primary cause of action and can be

maintained only so long as the primary action continues." *Yanovich v. Zimmer Austin, Inc.*, 255

F. App'x 957, 970–71 (6th Cir. 2007) (citing *Messmore v. Monarch Mach. Tool Co.*, 11 Ohio

App. 3d 67 (Ohio App. 9th Dist. 1983)).

Perry Township argues that because summary judgment is appropriate on all of Plaintiffs'

other claims, this derivative claim must fail. However, because some of the claims brought by

Plaintiffs survive summary judgment, the loss of consortium claim also is appropriate for the jury

to consider. Accordingly, the Court **DENIES** Perry Township's Motion for Summary Judgment

on this claim.

## V.

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Perry

Township's Motion for Summary Judgment (Doc. No. 55) and Officer Bean's Motion for

Summary Judgment (Doc. No. 58). Specifically, the Court:

27

1. **DENIES** Officer Bean's request for summary judgment on Plaintiffs' § 1983 claim;

2. **GRANTS** Officer Bean's request for summary judgment on Plaintiffs' assault and battery claim;

3. **DENIES** Perry Township's request for summary judgment on Plaintiffs' loss of consortium claim;

4. **DENIES** Perry Township's request for summary judgment on Plaintiffs' § 1983 claim based upon the Township's Use of Force Policy being the moving force behind Officer Bean's alleged violation of Hook's constitutional rights;

5. **GRANTS** Perry Township's request for summary judgment on Plaintiffs' § 1983 failure to train claim; and,

6. **GRANTS** Perry Township's request for summary judgment on Plaintiffs' § 1983 ratification claim.

**IT IS SO ORDERED.**


3-29-2013
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

28